STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATTHEW ROBERT JIMENEZ,
*Defendant-Appellant.*

Multnomah County Circuit Court
081134922; A142714

270 P3d 405

Garrett A. Richardson for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Shannon T. Reel, Assistant Attorney General, for respondent.

Before Ortega, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant in this case appeals a judgment of conviction for first-degree rape, ORS 163.375, first-degree sodomy, ORS 163.405, second-degree kidnapping, ORS 163.225, first-degree burglary, ORS 164.225, two counts of third-degree robbery, ORS 164.395, four counts of fourth-degree assault, ORS 163.160, unauthorized use of a vehicle, ORS 164.135, second-degree assault, ORS 163.175, strangulation, ORS 163.187, and stalking, ORS 163.732. Defendant assigns error to the trial court's denial of his motion for judgment of acquittal on the first-degree rape charge, contending that there was "insufficient evidence for his conviction of rape in the first degree by forcible compulsion, particularly given that [the victim] testified that she did not feel forced into having sexual intercourse with defendant."[1] After we initially affirmed without opinion, *State v. Jimenez*, 242 Or App 604, 255 P3d 676 (2011), the Oregon Supreme Court remanded the case to us for reconsideration in light of *State v. Marshall*, 350 Or 208, 253 P3d 1017 (2011). *State v. Jimenez*, 350 Or 573, 258 P3d 1239 (2011). Having considered *Marshall*, we again affirm.

The facts are undisputed. Although they were no longer in a relationship at the time of trial, defendant was the victim's boyfriend at the time of the events at issue and they lived together in defendant's mother's house. After the victim got off work at about 2:30 a.m., she called defendant, expecting to meet him at the house, but he told her not to come and she instead went to her mother's house with a male friend, Newcomer. Defendant later called the victim and, upon learning that she was with Newcomer, defendant became extremely angry, accusing the victim of cheating on him and calling her names. Defendant told the victim that she had better get home or she would be sorry. Because defendant had been violent toward her in the past, the victim understood from his statements that he would hurt her if she did not go home.

After hanging up with defendant, the victim asked Newcomer to drive her home. When she arrived at the house,

---

[1] Defendant was convicted on charges relating to three separate victims. Because only the first-degree rape conviction is at issue on appeal, all references to "the victim" herein relate to that conviction.

defendant and his friend Kulju were in the front yard. As soon as the victim walked into the yard, defendant punched her in the face, knocking her to the ground. As she lay there, defendant kicked her and stood over her, yelling at her and calling her names. Kulju stood by defendant's side wielding a baseball bat. Defendant told Kulju that he should hit the victim over the head with the bat, and Kulju agreed that he should, but never did so.

Defendant, still very angry, decided that he wanted money that the victim had been saving for a trip to New York and that she kept at her mother's house. When he informed the victim of his intention to go and get that money, she protested, adding that he was not allowed at her mother's house in any event. However, defendant grabbed the victim and shoved her into her car. Kulju got in, and defendant drove the three of them halfway to the victim's mother's house before stopping the car and demanding that the victim drive the rest of the way. While they were switching seats, as she rounded the back of the car, defendant hit the victim again, causing her to fall over the car's trunk. She then got into the car and drove the rest of the way to her mother's house.

Upon arriving there, defendant, the victim, and Kulju (still holding the baseball bat) went to the front door and found it unlocked. Defendant cited the unlocked door as further proof that the victim was cheating on him and pushed her into it. Eventually, the three went inside the house and down to the basement where the victim had a bedroom. Once there, defendant hit the victim again, causing her to fall onto the floor, where defendant kicked her. The victim jumped up and ran into her bedroom to hide her money before defendant could take it, but was not able to outrun defendant, who took the money from her.

Having gotten what they came for, defendant and Kulju wanted to leave. Although she refused to leave, the victim allowed Kulju to leave in her car. Defendant stayed with the victim for a couple of hours and then returned to his house.

Later that day, defendant called the victim and told her he wanted to come over again. He again accused her of cheating on him and told her that he would be bringing some friends with him to break into her mother's house. The victim

told him that she would let him in if he came alone, so defendant came back to the victim's mother's house and brought food and drink with him.

During that second encounter, defendant became angry with the victim because she was having a panic attack and was not eating the food he had brought her. He threw his drink at the victim and then demanded oral sex with her. She thought he was joking and laughed, but he insisted that he was serious and then grabbed the victim by the hair and forced her to perform oral sex on him. After a couple of seconds he released her, however, and then looked as though he felt guilty.

At that point defendant's demeanor changed and he apologized and began acting "much gentler." He stopped calling the victim names and cursing and stopped behaving violently. The two later went back into the victim's bedroom and lay down on the bed talking. Eventually, defendant asked the victim if she wanted to have sex, and she assented. According to the victim, she "said yes" to defendant and "didn't feel forced." When pressed about whether she believed that defendant would have forced her to have sex if she had not agreed, the victim reiterated, "I didn't do it out of fear. I didn't do it out of any sort of fear. I can't say what would have happened if I hadn't * * * because I * * * d[id]n't say no. I don't know what would have happened, but I didn't do it out of fear."

At the close of the state's evidence, defendant moved for a judgment of acquittal on the first-degree rape charge, contending that the victim had testified that "the sexual intercourse that took place was consensual and that there was no forcible compulsion in spite of attempts by [the state] to elicit from her" a different response. The trial court denied defendant's motion, and, ultimately, defendant was convicted of, among other things, first-degree rape.

We review the trial court's denial of a motion for judgment of acquittal to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the state proved all of the essential elements of the crime beyond a reasonable doubt. *State v. Lockamy*, 227 Or App 108, 113, 204 P3d 822 (2009). Here,

ORS 163.375(1)(a) defines the crime of first-degree rape as follows:

"(1)   A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"(a)   The victim is subjected to forcible compulsion by the person[.]"

As noted, defendant contends on appeal that the trial court erred in denying his motion for judgment of acquittal on the first-degree rape charge because, in light of the victim's clear testimony that she consented to sexual intercourse with defendant, the state failed to present legally sufficient evidence of forcible compulsion. The state responds that, based on defendant's treatment of the victim on the day of the incident up until the point when they had sexual intercourse, "a rational trier of fact could reasonably infer that defendant expressly or impliedly threatened to harm the victim, and thus subjected her to forcible compulsion when he had sexual intercourse with her." Accordingly, the issue presented is whether, from the evidence presented at trial, a rational trier of fact could find that the victim submitted to the sexual conduct at issue as a result of forcible compulsion.

The term "forcible compulsion" is defined by statute:

" 'Forcible compulsion' means to compel by:

"(a)   Physical force; or

"(b)   A threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person, or in fear that the person or another person will immediately or in the future be kidnapped."

ORS 163.305(2). Under that definition, forcible compulsion may be accomplished by either physical force or an express or implied threat.

As noted, the Supreme Court remanded this case to us for reconsideration in light of *Marshall*. In that case, the court examined the physical force aspect of forcible compulsion in the context of a first-degree sexual abuse case. The court addressed the issues of whether the forcible compulsion element of a sexual offense "must in some sense cause or result in the sexual contact" and "whether the term 'forcible

compulsion' contemplates a particular level of physical force."
350 Or at 216. As to the first issue, the court explained that
there is a "causal relationship between the actor's use of
physical force and the victim's submission to, or engagement
in, the sexual contact." *Id.* at 218. Furthermore,

"a single act of forcible compulsion that accompanies mul-
tiple acts of sexual contact does not necessarily transform
each of those sexual contacts into separate instances of
first-degree sexual abuse. Instead, for each of the sexual
contacts that the state charges, the state must rely on an
act of 'forcible compulsion' that bears some causal relation-
ship to the sexual contact: It must, in some sense, result in
that *particular* sexual contact."

*Id.* at 219 (emphasis in original).

With respect to the level of physical force required by
the statute, the state

"must show that the physical force that the defendant used
was greater in degree or different in kind from the simple
movement and contact that is inherent in the [sexual con-
tact at issue] and that the force was sufficient to compel the
victim to submit to or engage in the sexual contact, against
the victim's will."

*Id.* at 227.

However, here the state focuses on the threat aspect
of forcible compulsion, contending that defendant's conduct
on the day in question constituted an express or implied
threat to harm the victim. As we recently explained in *State
v. Magel*, 246 Or App 725, 730, 268 P3d 666 (2011), "for an act
to constitute forcible compulsion by threat, there must be
some kind of communication by the defendant to the victim of
intent to inflict harm." The defendant's communication may
be "directly or distinctly stated," *id.* (internal quotation
marks omitted), or it may be "communicated or conveyed not
by a direct, 'forthright statement but by allusion or reference
likely to lead to [a] natural inference,' " *id.* (quoting *Webster's
Third New Int'l Dictionary* 1135 (unabridged ed 2002)) (alter-
ation in *Magel*). Thus, the question in cases involving a
threat is whether there was evidence of an "expression by
[the] defendant of an intent to inflict harm on the victim or
another such that that expression could have compelled the

victim to engage in the sexual contact at issue." *Id*. at 731. We explained that "a threat that is sufficient to compel a person to submit to sexual contact will vary depending on the surrounding circumstances, including the parties' respective ages and the history and relationship between them." *Id*. at 734.

Applying those standards here, we conclude that, from the evidence presented, a rational jury could find that defendant communicated an intent to inflict harm on the victim that was sufficient to compel her to submit to the sexual contact at issue. We observe that defendant's entire argument is based on the victim's statement that she agreed to the sexual contact and that she did not do so because of force or fear—but the jury was free to disbelieve that testimony and, instead, to base its decision on its interpretation of the circumstances under which the sexual contact occurred. *See State v. Fox*, 111 Or App 362, 366, 826 P2d 89 (1992) ("In a criminal case, a jury may believe or disbelieve any item of evidence, even if it is uncontroverted.").[2]

Here, defendant engaged in an extended episode of violence directed at the victim. He threatened her while his friend stood by wielding a baseball bat. He repeatedly punched and kicked her and called her names. Defendant forced the victim to drive him to her mother's house and, once they were there, took her money. After leaving the house he threatened to break into the house with the help of friends, and, once he returned to the house, he threw a drink on the victim, demanded oral sex and, when she did not comply, forced her to do so. A rational factfinder could conclude that that extended course of conduct constituted an implied threat which communicated, by natural inference, that defendant would harm the victim if he was angry or if she did not comply with his demands. Furthermore, given that defendant had hurt the victim in the past and given the severity of his conduct on the day in question, a rational trier of fact could

---

[2] As defendant correctly points out, "disbelieving the victim or discounting her testimony * * * does not add anything affirmative to the state's evidence." *State v. Reed*, 339 Or 239, 245, 118 P3d 791 (2005). However, in this case, as we explain, the circumstances surrounding the sexual contact are such that a reasonable finder of fact could conclude that defendant subjected the victim to a threat and that she submitted to the sexual contact against her will as the result of that threat.

conclude that the threat communicated by defendant's conduct was sufficient to, and in fact did, compel the victim to submit to sexual intercourse with him against her will when he requested it. *Cf. State v. Odoms*, 117 Or App 1, 844 P2d 217 (1992), *rev den*, 316 Or 529 (1993) (setting forth circumstances under which a rational jury could infer that the defendant expressly or impliedly threatened the victim). Thus, we conclude that, under the circumstances presented here, the trial court properly denied defendant's motion for judgment of acquittal on the charge of first-degree rape.

Affirmed.