Submitted November 4, 2014, affirmed February 4, 2015

In the Matter of J. L. S.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

J. L. S.,
*Appellant.*

Lincoln County Circuit Court
118090J;
Petition Number 118090;
A151136

343 P3d 670

Charles P. Littlehales, Judge.

Susan D. Isaacs filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Erin C. Lagesen, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

## TOOKEY, J.

Youth, who was 17 years old at the time of the events giving rise to his adjudication, appeals a juvenile court judgment finding him within the jurisdiction of the court for initiating a false report, ORS 162.375.[1] For the reasons that follow, we affirm.

One night after midnight, youth's sister discovered that youth, who did not have permission to leave the house, was not in his bedroom at their house in Depoe Bay. Youth's sister spoke to youth's father, and youth's father called youth.

Youth told his father that he had been kidnapped from the house at gunpoint and driven to Portland, but that he had escaped and had called two friends, who had come to pick him up. Youth's father met youth and his friends in Salem and drove youth back home. During the drive, youth's father told youth that they needed to call the police, and youth twice told his father not to do so. After they returned home, youth's father, who believed that his son had been kidnapped, called the police.

Miller, a detective with the Lincoln County Sheriff's Office, responded to the family's home in Depoe Bay. She first interviewed youth's father, who told her that youth had told him that youth had been kidnapped to Portland but had escaped.

Miller then interviewed youth. In the "first version" of his story, youth told Miller that, while he was in his bedroom, he had seen a man standing outside his window. According to youth, the man "was wearing sunglasses, a hoodie, and a scarf over his mouth. He had a gun, and he ordered [youth] to come outside."

---

[1] ORS 162.375(1) provides:

"A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report which is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

ORS 162.375 was amended in 2013. Or Laws 2013, ch 490, § 1. That amendment does not affect our analysis in this case. For simplicity, throughout this opinion, we refer to the current version of the statute.

Youth told Miller that he climbed out of the window, and the man, who "had him at gunpoint[,]" then walked him to the car, put him in the backseat of a black sedan, and drove him to Portland. Youth said that, while they were driving around in Portland, they stopped at a stoplight, and youth jumped out of the car, ran, "zigzag[ged]," found a 7-Eleven, and called two of his friends, who came to pick him up.

When youth showed Miller his bedroom and the scene outside his bedroom, Miller observed that youth's story was not consistent with what she found in the bedroom. The bedroom had not been disturbed. The screen was on the window, the lights were out, and the blinds were up. Because things "just did not make sense" to Miller, she told youth that she did not believe him. Youth then "gave [Miller] a new and improved version" of the events on the night in question. "[H]e added that the gunman was speaking Russian with the other man who was driving." He also added that, "after he ordered him out the window, then the gunman turned and put the screen back in the window."

Miller repeatedly advised youth that she did not believe him and gave him "lots of opportunities to tell the truth, because the evidence was just not fitting the story." She also advised him that, if he persisted with his story, she was going to have to call out the Major Crime Team. Specifically, Miller told youth that the police were going to have to go to Portland and that "[t]here was going to be a lot of investigation, because if he was kidnapped, it was very serious." In other words, she told youth that, "if someone's out there who's going to kidnap people and hurt people[,]" then the police "needed to get on it" because it was a "serious matter." She also explained that it was a "financial burden"—i.e., that it involved a significant expense—to call out the members of the Major Crime Team on a weekend. She also specifically warned youth that, if his story was determined to be false, he could get a citation for initiating a false report.

When, despite those warnings, youth "stuck to * * * his version" of events, Miller "activated the Major Crime Team." Several members of the Major Crime Team responded,

and they met at the Depoe Bay Fire Hall. "[P]art of [the] Major Crime Team is State Police from Springfield[,]" and two detectives came from Springfield, Oregon, to assist. In the meantime, Miller interviewed youth's friends, who had picked him up in Portland. Another deputy, who assisted Miller, photographed youth's bedroom. He also photographed the outside of the bedroom window and the yard and seized the screen to fingerprint it. Miller, who had obtained youth's consent to search two cell phones, assigned a sergeant and a detective to search those phones.

While searching the phones, the police discovered text messages between youth and his friends "about a plan to *** meet and sneak out." For example, in one message, youth texted, "I'm going to *** Portland tonight. Wish me all the luck you can." In another message, youth texted, "KK, tell me when you're off so I know the fifteen-minute mark."

The police then returned to the house and told youth what they had found. When confronted with that evidence, youth was initially "defiant," but, after speaking to his parents, he admitted that he had not told the truth—that is, "he admitted that he wasn't kidnapped."

The Lincoln County Juvenile Department subsequently filed an amended petition to find youth within the jurisdiction of the court for violating ORS 162.375 by "unlawfully and knowingly initiat[ing] a false report, which was transmitted to a law enforcement agency, to-wit: Lincoln County Major Crime Team." At an adjudicatory hearing, youth moved to dismiss the case on the ground that the state failed to provide sufficient evidence to establish that he had violated ORS 162.375 under a proper construction of the statute. Youth argued that he "did not do anything unlawful" because he merely lied to his father about a kidnapping and there was no evidence that he knew that his father was going to call the police. Youth also argued that he did not violate ORS 162.375 when he lied to Miller, on the ground that false statements made to a police officer in the context of an investigation "do not constitute a violation of the law." To support his latter argument, youth relied upon *State v. McCrorey*, 216 Or App 301, 172 P3d 271 (2007), which we discuss below.

The state responded that there was sufficient evidence for the court to find that youth violated ORS 162.375. The state argued that there were "two pivotal points" in this case—the point at which youth's father called the police and the point at which Miller activated the Major Crime Team. As to the first pivotal point, the state argued that youth knowingly initiated a false alarm or report when he told his father that he had been kidnapped, because youth had to have known that his father was going to call the police. As to the second pivotal point, the state argued that youth's conduct was

> "not merely just lying to officers in the course of an investigation. It is, 'If you persist with this story, I'm going to have to report this to the Major Crime Team. I'm going to have to report this to a further law enforcement agency. And so this is your time to tell me, 'Don't do that.' Because you, you are initiating this action that I am going to have to take,' is what Detective Miller is telling him. 'This is your time to stop that.'

> "And he persisted with his story. He caused her to initiate a callout of the Major Crime Team. And that is * * * initiating a false report."

The juvenile court denied youth's motion to dismiss. In so doing, the court stated, "In this case, the initial report was false, * * * going to Father then to the police. And * * * [youth] kept the thing going by pushing * * * Detective Miller on to doing what the statute was intended to stop, which was imposing an * * * obligation on * * * law enforcement on matters which weren't true." The court then found youth within the jurisdiction of the court for violating ORS 162.375, and youth now appeals.

On appeal, youth argues that the court erred in finding him within the jurisdiction of the court for violating ORS 162.375, essentially renewing his argument that there was insufficient evidence to support his adjudication under a proper construction of the statute. Youth first argues that he did not violate ORS 162.375 because "youth's father, not the youth, initiated a police investigation, directly contrary to the youth's requests that he not do so." Again relying on *McCrorey*, youth also argues that his statements to Miller

were merely "unsworn, oral falsifications made in response to police questioning." 216 Or App at 306.

The state responds that "youth's conduct violated the statute in two different ways." The state first argues that "youth initiated a false alarm or report which was transmitted to a law enforcement agency when youth falsely told his father that youth had been kidnapped, when youth knew that his father would transmit that false alarm or report to law enforcement." The state also argues that "youth again initiated a false report to the Lincoln County Major Crime unit when he falsely reported to Detective Miller that he had been kidnapped, knowing that she would have to transmit that report to the Lincoln County Major Crime Team[.]"

The issue on appeal is whether the juvenile court erred when it found youth within the jurisdiction of the court for violating ORS 162.375—that is, whether there was sufficient evidence to support youth's adjudication. That ruling involves an issue of statutory interpretation, which we review for legal error. *See State v. Thompson*, 328 Or 248, 256, 971 P2d 879, *cert den*, 527 US 1042 (1999) ("A trial court's interpretation of a statute is reviewed for legal error.").

When interpreting a statute, our goal is to discern legislative intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). We start with the statutory text because it is "the best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). When a term is defined by a statute, we look to the statutory definition, but when a term is not statutorily defined, we look to dictionary definitions to ascertain the plain meaning of the term. *See Gaines*, 346 Or at 175 (using dictionary definitions to discern the plain, natural, and ordinary meaning of terms); *see also State v. Fries*, 344 Or 541, 545-50, 185 P3d 453 (2008) (using context to determine which of multiple definitions is the one that the legislature intended). "We ascertain the legislature's intentions by examining the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Cloutier*, 351 Or 68, 75, 261 P3d 1234 (2011) (citing *Gaines*, 346 Or at 171-73).

As noted above, ORS 162.375(1) provides that "[a] person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report which is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property." The relevant terms of ORS 162.375 are not statutorily defined. However, as we have previously explained, "[t]he dictionary definition of 'initiate' is 'to begin or [s]et going'" and "[t]he term connotes proactive, as opposed to reactive, conduct." *McCrorey*, 216 Or App at 305 (quoting *Webster's Third New Int'l Dictionary* 1164 (unabridged ed 2002)). As used in ORS 162.375, the statutory term "alarm" refers to something, like a fire alarm, which makes a sound or provides a signal that gives notice of danger. *See Webster's* at 48 (defining "alarm" as "a sound or signal giving notice of danger or calling attention to some event or condition"). As used in ORS 162.375, the statutory term "report," at minimum, refers to an assertion that a person should reasonably understand, in the context in which the assertion is made, is likely to be transmitted to one of the specified emergency responders and cause a response. *See id.* at 1925 (defining the noun "report" as "NOTIFICATION"; defining the verb "report" as "to make known to the proper authorities : give notification of <~a fire> <~an accident>") (boldface in original). The statutory term "transmitted" is a form of the word "transmit," which may be defined as "to cause to go or be conveyed to another person or place[.]" *Id.* at 2429. Thus, under the plain terms of the statute, a person violates ORS 162.375 when the person knowingly begins or sets going either a false alarm (a sound or signal) or a false report (an assertion or notification that the person should reasonably understand is likely to be transmitted to one of the specified emergency responders and cause a response), causing that false alarm or report to be conveyed to a fire department, law enforcement agency, or other organization that deals with emergencies involving danger to life or property.

When considering those terms in context, we note, as an initial matter, that ORS 162.375 contains both active and passive verbs. The term "initiates," which connotes proactive conduct, is set out in the active voice. By setting out the term "initiates" in the active voice, the legislature

signaled that the actor is "the person" who knowingly begins or sets going a false alarm or report. In contrast, the term "transmitted" is set out in the passive voice. By setting out the term "transmitted" in the passive voice, the legislature signaled that it was choosing not to identify the actor or mechanism that must transmit the false alarm or report. *See State v. Mullins*, 352 Or 343, 349, 284 P3d 1139 (2012) (stating that the statutory wording, "'after the defendant receives notice,'" as provided in ORS 138.083, "is set out in the passive voice and therefore does not identify the actor who must deliver notice to the defendant").

We further note that ORS 162.375 was enacted as part of the omnibus 1971 criminal code revisions by the Criminal Law Revision Commission. Or Laws 1971, ch 743, § 212. While revising the Oregon Criminal Code, the Oregon Criminal Law Revision Commission kept careful records of the proceedings. *See State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980) (noting that carefully kept records of the proceedings "provide a rich source for determination of the drafters' intent"). Commentary regarding the section that is now codified as ORS 162.375 provides:

"Criminal statutes dealing with false fire alarms are found in nearly all American jurisdictions. The rationale supporting criminal liability is based upon the waste of government resources involved and the creation of circumstances where personnel and equipment are made unavailable to deal with legitimate emergencies. Section 212 is intended to reach fire and police departments, and all other organizations, public or private, that respond to emergency alarms involving danger to life or property. The section applies whether the false alarm was directly or indirectly caused to be transmitted. Criminal liability should not be dependent on whether the person acted himself or caused another to act for him."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 212, 208-09 (July 1970).

Before applying those principles to the facts of this case, we pause to clarify the scope of our analysis. The parties appear to agree that this case involves two separate acts—as the trial court put it—(1) youth "going to Father"

who then went to the police,[2] and (2) youth "ke[eping] the thing going by pushing * * * Detective Miller on to doing what the statute was intended to stop, which was imposing an * * * obligation on * * * law enforcement on matters which weren't true." We focus our analysis on youth's second act—that is, his conduct with Miller.

When we apply the plain terms of the statute to youth's second act, we first note that, when speaking to Miller, youth repeatedly asserted that he had been kidnapped, when in fact, he had not been kidnapped. We further note that, at that point, Miller had not yet activated the Major Crime Team, and thus, no false report had been transmitted to the Major Crime Team. That fact is significant to our analysis because, according to Miller's uncontroverted testimony, Miller repeatedly told youth that she did not believe his story and gave youth "lots of opportunities to tell the truth." Presumably, if youth had told Miller the truth at that point, no false report would have been transmitted to the Major Crime Team and the Major Crime Team would not have been activated. We also note that Miller advised youth that, if he persisted with his story, she was going to have to call out the Major Crime Team. That fact is also significant to our analysis because, in the context of this case, youth knew that his assertion was going to be transmitted to a law enforcement agency and cause a response. Thus, we conclude that, when, in this case, youth repeatedly and falsely asserted to Miller that he had been kidnapped, he knowingly initiated a false report which was transmitted to the Major Crime Team, an organization that deals with emergencies involving danger to life or property, in violation of ORS 162.375.[3]

That conclusion is supported by legislative history. As noted above, legislative history indicates that criminal liability under ORS 162.375 does not depend on whether a person acts for himself or causes another to act for him. Thus, the fact that the false report was transmitted to the

---

[2] Given our resolution of this case, we need not decide and do not decide whether youth violated the statute by "going to Father."

[3] The parties assume, as do we, that the Major Crime Team is an "organization that deals with emergencies involving danger to life or property." ORS 162.375.

Major Crime Team by Miller, and not by youth, does not make ORS 162.375 inapplicable. Further, youth, who was warned that there was significant expense involved in calling out the members of the Major Crime Team on a weekend, caused "the waste of government resources" and made law enforcement personnel and equipment "unavailable to deal with legitimate emergencies[,]" thus causing the exact harm that the statute was enacted to prevent.

In so concluding, we specifically reject youth's argument, based on *McCrorey*, that his statements were merely "unsworn, oral falsifications made in response to police questioning." 216 Or App at 306. In *McCrorey*, the defendant's daughter was driving a vehicle without a license when the vehicle was struck by a hit-and-run driver, and someone[4] reported that accident to the police. The defendant, who was not in the vehicle at the time of the accident, later told an investigating officer that, when the accident occurred, she was driving the vehicle with her daughter as passenger. Based on that conduct, defendant was charged with violating ORS 162.375.

The issue in *McCrorey* was "whether a person may be convicted under [ORS 162.375] for initiating a true report and later supplying false information about that true report in response to police questioning, or whether a person is culpable only if the initial report of the incident is false." *Id.* at 305. After reviewing the legislative history of ORS 162.375,[5]

---

[4] The record in *McCrorey* did not reveal who contacted the police or the content of that communication. 216 Or App at 303 n 1. However, the record contained "evidence sufficient to support an inference that either [the] defendant or [her daughter] initiated the report of a hit-and-run accident, [and] the trial court found that that report was true." *Id.* at 306.

[5] In our discussion of the legislative history of the statute, we noted that the first preliminary draft of the statute included the language "'knowingly *** mak[ing] or caus[ing]* to be made a false alarm or report'" and that, in order to exclude unsworn, oral falsifications, that language was replaced with "'knowingly *initiat[ing]* a false alarm or report' to remove from the state's reach the witness who lies to the police while giving a statement." *McCrorey*, 216 Or App at 306 (citing Minutes, Criminal Law Revision Commission, Subcommittee No 2, Sept 16, 1969, 18-19) (emphases in *McCrorey*). We observed that "the legislature clearly intended to exclude unsworn, oral falsifications made in response to police questioning[.]" *Id.* We also noted that the change was meant to clarify that ORS 162.375 was specifically "directed to the report of an emergency situation." *Id.* (internal quotation marks and brackets omitted). As noted above, and notwithstanding youth's assertions to the contrary, this is precisely the case presented by

we "conclud[ed] that a conviction under that statute must be supported by evidence that the defendant *initiated* the falsification, rather than *mere evidence that a defendant initiated a process that later resulted in that person giving false information about a true incident to police.*" *Id.* at 306 (emphasis in original). We further concluded that there was insufficient evidence to demonstrate that the defendant had initiated a false report within the meaning of ORS 162.375, because the record revealed only that the "defendant lied while later giving a statement to the police" and that evidence did "not support an inference that [the] defendant gave that information as part of the initial report" of the incident. *Id.*

As our review demonstrates, *McCrorey* does not aid youth. First, the question at issue in *McCrorey*—"whether a person may be convicted under [ORS 162.375] for initiating a true report and later supplying false information about that true report in response to police questioning"—is not directly at issue in this case because youth's conduct does not involve a true report or a true incident. *Id.* at 305. Further, the conduct at issue in *McCrorey*—making false statements to police about a true incident—did not cause a false report "to go or be conveyed to another person or place"—that is, the defendant's false statements were not further transmitted to another law enforcement agency or other organization that deals with emergencies involving danger to life or property. *Webster's* at 2429.

In sum, we conclude that there was sufficient evidence to support youth's adjudication based on a violation of ORS 162.375—that is, we conclude that, when youth repeatedly and falsely asserted to Miller that he had been kidnapped, he knowingly initiated a false report which was transmitted to the Major Crime Team, an organization that deals with emergencies involving danger to life or property. Thus, the juvenile court did not err when it found youth within the jurisdiction of the court.

Affirmed.

---

the instant facts, because, when youth repeatedly and falsely asserted to Miller that he had been kidnapped, he knowingly initiated a false report which was transmitted to the Major Crime Team, an organization that deals with emergencies involving danger to life or property.