Argued and submitted February 25, 2014, affirmed August 19, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KIP MICHAEL KAWAMOTO,
*Defendant-Appellant.*

Multnomah County Circuit Court
110531946; A151448

359 P3d 305

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael J. Slauson, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Rebecca M. Johansen, Assistant Attorney General.

Before Nakamoto, Presiding Judge, and Garrett, Judge, and De Muniz, Senior Judge.*

GARRETT, J.

---

* Garrett, J., *vice* Armstrong, P. J.

## GARRETT, J.

Defendant was convicted of one count each of first-degree assault, ORS 163.185; first-degree sodomy, ORS 163.405; and first-degree unlawful sexual penetration, ORS 163.411; and two counts of first-degree kidnapping, ORS 163.235. The trial court sentenced defendant to a total of 280 months in prison and 20 years of post-prison supervision (less time served). The two kidnapping counts merged.

On appeal, defendant contends that the trial court should have granted his motion for a judgment of acquittal on the charges of kidnapping and unlawful sexual penetration because the state failed to prove necessary elements of those offenses. Defendant held the victim in a bedroom at defendant's home for approximately two days, during which time he committed a series of violent sex acts against her, including penetrating her anus with a baseball bat. As to the kidnapping conviction, defendant argues that the state failed to prove that defendant "secretly confine[d] the person in a place where [she] [was] not likely to be found," ORS 163.225(1)(b), because other people were present at the house at various times and knew that the victim was there. As to the charge of unlawful sexual penetration, defendant argues that the state failed to prove "forcible compulsion." For the reasons that follow, we disagree with both of defendant's arguments and conclude that the evidence was sufficient to allow a rational factfinder to find the elements of both crimes beyond a reasonable doubt.

The nature of defendant's arguments requires us to recount the facts in detail. Although defendant challenges the sufficiency of the state's evidence on narrow grounds discussed later in this opinion, the following facts are not disputed. On April 28, 2011, defendant attended a sporting event with his cousin, Longshore. When defendant returned home, his roommate, Burgoon, was there, but he soon left for the evening. Meanwhile, Longshore went to the victim's hotel room; they drank at a bar, where the victim became heavily intoxicated, and then went to defendant's house, where the victim fell asleep on a couch. The record reflects that the victim and defendant were acquainted because

defendant was the victim's drug dealer and that they shared several mutual acquaintances.

The victim awoke on the couch in defendant's house when defendant punched her in the face and said, "bitch, get in the room." Longshore was also "right there." The victim went to defendant's bedroom. She later testified that she was intermittently conscious and that defendant continued to punch her and hit her with a baseball bat. When asked by the prosecutor to describe "the first thing" the victim remembered, she recalled being on the floor, and defendant was hitting her in the face and telling her to "suck his dick." The victim was screaming and refused. Defendant inserted his penis into her mouth. The victim also testified that defendant was "really, really angry," and that he had urinated on her and had inserted a baseball bat into her anus, but she could not recall how many times. Defendant did not tell the victim that she could not leave, but she believed that she could not leave. She was "hurt really bad" and could "barely lift up [her] head" and did not want to anger defendant again. Defendant later apologized, cried, and held the victim. The victim said defendant told her that she was "going to stay [t]here for a couple days" to "heal" or "get better."

Burgoon returned to the house the next day, April 29. He saw defendant, the victim, and Longshore there. He testified that the victim's face was bruised and swollen and that she looked beaten up to the point that Burgoon "barely" recognized her. Defendant told Burgoon that he "took it to" the victim. The victim was in defendant's room. Blood was on the floor and in the hallway. Burgoon considered calling an ambulance but did not. He did not stay at the house that night. When Burgoon returned to the house again around noon on April 30, the victim was still there.

That same day, around 4:00 p.m., Portland Police Officer Kraner received a call regarding a welfare check on a person by the victim's name. According to Kraner's trial testimony, the caller reported that a woman with the victim's first name was being "held against her will in a home" in North Portland, that she was being held by a man with defendant's first name, that she had been "severely beaten" and "was not allowed to leave the location." The caller also informed

Kraner that defendant "and his associates" who lived at the house in question were "low[-]level drug dealers * * * armed with baseball bats." Police took the caller in a patrol car to identify the house in question, which was defendant's house.

At 5:00 p.m., Kraner and four other officers arrived at defendant's house. Kraner observed someone in the house close the front door. Burgoon was standing on the sidewalk outside of the house. Kraner testified that Burgoon's "hands were shaking" and that he "repeatedly was glancing towards the house, very nervously." Officers then took him into custody.

Inside the house, defendant told the victim and Sonia, a friend of the victim's who had just arrived, to be quiet, and he covered the victim, including her face, with bedding materials. Police commanded that the door of the house be opened; after getting no response, Kraner forced entry into the home. Kraner then saw defendant and Sonia, who both looked to be "extremely surprised and in shock." Officers removed defendant and Sonia from the house and placed them into custody.

In one of the bedrooms, Kraner saw a pile of bedding with "two hands sticking straight up" out of the pile. Kraner identified himself as a police officer, and he heard "someone faintly calling out for help." Kraner found the victim "swaddled * * * [and] wrapped really tightly" in the bedding. Upon uncovering the victim's face, Kraner testified that

"[h]er head was extremely swollen. Her eyes were purple, swollen completely shut. Her head was like the size of a basketball; it was that swollen. I noticed that her hairline was actually—her scalp was swollen, which caused her hair to be pushed straight up off of her head. Her lips were swollen. I could see kind of inside of her mouth, and it seemed like the inside portion of her mouth was swollen. I pulled back the bedding even more and exposed parts of her body, like her arms and her legs, and the exposed portions that I could see were covered in dark purple bruises, anywhere on her body that I could * * * see."

The victim told Kraner that "[defendant] did this to me" and wanted to make sure he was no longer at the house. Paramedics transported the victim to a hospital.

At the hospital, the victim was treated by a sexual assault nurse, Anderson. At trial, Anderson testified that the victim was "in and out of consciousness," had "difficulty controlling her pain," and provided information in "bits and pieces" rather than in "one continuous narrative." The victim told Anderson that defendant was "mad because he broke a bong," refused to let the victim leave the house, and that defendant kept "hitting * * * and hitting" her. At some point, a woman named "Trish" knocked on the bedroom door, defendant answered it, and when the victim said "please let me leave," defendant kept hitting her and then "threw" her. The victim later clarified, at trial, that, although "Tricia" and another person, "Corey," had stopped by the home, neither person was "allowed to see" her and "didn't even know [she] was there." Anderson testified that, while at the hospital, the victim had said that her recollection was "really blurry," and that she did not "remember what happened," but that the victim had told her that "[defendant] fucked me up. He hit me with a bat. He stuck the bat inside me. Now my butt and crotch hurt me." The victim further explained to Anderson that defendant had "peed on [her]," penetrated her mouth with his penis, and "maybe" put a bat in her vagina and anus. The victim also told Anderson that defendant said, "sit the fuck down, you're not leaving."

Police found three baseball bats at the scene that tested positive for blood. The bats had DNA that was consistent with both defendant's and the victim's DNA. Blood stains on the floor of the home also contained the victim's DNA. The victim's DNA was also found to be present on defendant's penis.

At the conclusion of the state's case, defendant moved for a judgment of acquittal on the charges of first-degree kidnapping and first-degree unlawful sexual penetration. Defendant argued that the victim was seen by "numerous people in and out of the house. It was in a residence where there was obviously substantial traffic, and there was nothing that suggests that she was in a place where she was not likely to be found." Defendant also argued that, even assuming that the victim had been anally penetrated with a bat, there was no evidence that that act occurred "under forcible compulsion." The trial court denied the motion. On

appeal, defendant reprises his arguments to the trial court regarding the sufficiency of the evidence.

"We review the trial court's denial of a motion for judgment of acquittal to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the state proved all of the essential elements of the crime beyond a reasonable doubt." *State v. Magel*, 246 Or App 725, 729, 268 P3d 666 (2011).

We begin with defendant's challenge to his conviction for kidnapping. ORS 163.235 provides as follows:

"(1)  A person commits the crime of kidnapping in the first degree if the person violates ORS 163.225 with any of the following purposes:

"* * * * *

"(c)  To cause physical injury to the victim;

"(d)  To terrorize the victim or another person[.]"

ORS 163.225, the statute incorporated by reference above, sets out the elements of second-degree kidnapping. As pertinent to this case, that statute provides as follows:

"(1)  A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"* * * * *

"(b)  Secretly confines the person in a place where the person is not likely to be found."

The state charged defendant with first-degree kidnapping under the "secret confinement" theory set forth in ORS 163.225(1)(b). Thus, the state was required to prove that defendant "secretly confine[d] [the victim] in a place where [she was] not likely to be found." In determining whether a person was secretly confined in a place where the person is not likely to be found, we must "take into account the circumstances of the place, the victim, and the defendant's actions." *State v. Parkins*, 346 Or 333, 343, 211 P3d 262 (2009).

Defendant highlights the following facts: Longshore was with the victim when she first arrived at defendant's home on April 28; Burgoon saw the victim there on each of the next two days; at one point, the victim's friend, Sonia, was in the house; and defendant, the victim, and other persons who were intermittently present all knew each other. Thus, defendant reasons, other people knew where the victim was and were "aware of where she probably and likely would be found if they searched for her"—a fact that was confirmed when the anonymous caller led the police to the victim's location.

Defendant analogizes this case to *Parkins*. In that case, the defendant, a friend of the victim's family, visited their home and ended up alone at the house with the victim (an 11-year-old girl) and her older sister. *Parkins*, 346 Or at 335-36. The victim saw her sister smoking a cigarette and asked where she got it. The sister said that she got it from the defendant. *Id.* at 336. The victim found the defendant in a bedroom. After the victim entered the bedroom, the defendant locked the bedroom door, forced the victim onto a bed, climbed on top of her, threatened her when she tried to scream, and then struck her face and made sexual contact. *Id.* The victim escaped when her "sister rattled the doorknob to the locked bedroom[,]" the "[d]efendant let [her] up, and she unlocked the door and ran out of the room." *Id.*

The issue on appeal, as in this case, was whether, within the meaning of ORS 163.225(1)(b), the defendant had secretly confined the victim in a place where she was "not likely to be found." The Supreme Court held that he had not. The court explained that the statutory phrase means that "a person is held or restrained in a place where it is not probable that the person will be located, either accidentally or through searching. Both the words and their meaning are straightforward." *Id.* at 342. The court also observed:

> "Here, the key words in the phrase at issue are 'secretly,' 'likely,' and 'found.' The dictionary defines 'secret' as 'kept from knowledge or view' and 'concealed.' 'Likely' means probable or 'having a better chance of existing or occurring than not.' 'Found' is the past tense of 'find,' which means 'to come upon accidentally' and 'to come upon * * * by searching or effort.'"

*Id.* at 342 n 2 (quoting *Webster's Third New Int'l Dictionary* (unabridged ed 2002)) (citations omitted; alteration in *Parkins*). The court concluded that, although the evidence was sufficient to prove that defendant had "secretly confined" the victim (by locking the bedroom door, pinning her down, and threatening her), *id.* at 343, the evidence was insufficient to prove that the confinement had occurred in a place where the victim was not likely to be found. That was so because the victim's sister "either knew that the victim had gone to [the] bedroom, or at least would have thought that she had done so," and thus "it also was probable, and thus *likely*, that the sister would have found the victim through searching." *Id.* at 344 (emphasis in original).

Defendant argues that this case is materially indistinguishable from *Parkins* because, although defendant may have taken steps to "secretly confine" the victim, other people were aware at all times that the victim was in defendant's house and that she would likely be found there if they looked for her. The state counters by taking a different view of the record. Although defendant asserts that "several people" knew the victim's whereabouts, the state points out that the record demonstrates such knowledge by only two people (in addition to defendant): Longshore and Burgoon. Three other individuals are mentioned in the record: "Trish" (or Tricia), Corey, and Sonia, the victim's friend, who was in the house when police arrived. But, although Trish and Corey visited the house, a factfinder could find that neither of them was aware that the victim was present and the victim testified that Sonia arrived at the house just "two minutes" before the police did. Thus, we agree with the state that a rational factfinder could have concluded that, during the victim's two-day confinement, none of those three people had knowledge that the victim was at defendant's house or was likely to be found there.

The question thus reduces to whether Longshore's and Burgoon's knowledge of the victim's presence at defendant's house is sufficient to defeat a conclusion that the victim was "not likely to be found" there for purposes of the kidnapping statute. The state argues, in essence, that just because two of defendant's friends (one of whom was a roommate) happened to know that the victim was confined in

defendant's house does not mean that she was "likely to be found" there. That is particularly so, reasons the state, because one could infer from the record that either Longshore or Burgoon, or both of them, were accomplices to defendant's crimes—or, at a minimum, were not inclined to help the victim or disclose her location to others. In the state's view, the statute cannot mean that "secret confinement" must occur in "a place where the person is not likely to be found" *by anyone*; otherwise, a person could evade the coverage of the statute simply by keeping an accomplice informed.

We agree with the state. Although the statute does not specify *by whom* a person must be likely to be found, our charge is to construe the statute in a manner that effectuates its purpose and intent. *See State v. J. L. S.*, 268 Or App 829, 834, 343 P3d 670 (2015) ("When interpreting a statute, our goal is to discern legislative intent." (Citing *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009).)); *see also PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (explaining that the statutory text is "the best evidence of the legislature's intent"). The text and context make it clear that the purpose of the statute is to prohibit the confinement of a person in a place where she is not likely to be found *by those who could reasonably be expected to assist her.*

Such a reading of the statute was implicit in *Parkins*. In that case, the victim's sister had knowledge of where the victim had gone—to seek out the defendant inside the house. Under those circumstances, the victim's sister did not need to search for the victim, nor would she have come across her accidentally, as she was wholly aware of the victim's whereabouts. That knowledge was confirmed when the sister later attempted to open the bedroom door. *Parkins*, 346 Or at 344. The court, therefore, did not need to consider whether the victim would have been "unlikely to be found" if the sister had not been prepared to come to her aid. Here, in contrast, Burgoon and Longshore knew where the victim was, knew that she had been badly injured by defendant, and took no steps to assist her.

Additionally, we have held that a victim may be "not likely to be found" even in an obvious place, if assailants

take steps to conceal the victim's whereabouts. *See State v. Montgomery*, 50 Or App 381, 386, 624 P2d 151 (1981). In *Montgomery*, we held that the bathroom of the victim's own home was not a place the victim was "likely to be found" because the defendant and his brother had "made a calculated effort" to ensure that police "would not find the victim in his own apartment and they succeeded." *Id.* at 387. In doing so, the defendant held a knife to the victim's throat and told the victim that the defendant would cut the victim's throat if he made a sound when police came to the apartment door and inquired as to the victim's whereabouts, and the defendant's brother told police that the victim had left the premises. *Id.* at 383. Under those circumstances, we concluded, "the jury was entitled to find that defendant confined the victim in a place where he was not likely to be found." *Id.* at 387.

Likewise, here, defendant's actions demonstrated a "calculated effort" to ensure that the victim would not be found by any observer who would help her. Defendant had concealed the victim in a bedroom over the course of two days, covered her in bedding when police arrived, and drawn the curtains and locked the front door.

In short, it would be contrary to the statutory purpose to allow knowledge of a victim's location by a third party to defeat operation of the statute as a matter of law, regardless of that third party's identity, circumstances, and motives. *Parkins*, 346 Or at 343 ("[D]etermining whether a person was secretly confined in a place where the person is not likely to be found must take into account the circumstances of the place, the victim, and the defendant's actions."). Additionally, calculated efforts to conceal a confined victim from individuals who may *actually* render aid bolsters the unlikelihood that the victim will be found. Under the circumstances of this case, therefore, it was proper for the factfinder to decide whether defendant's bedroom was a location where the victim was "not likely to be found." Accordingly, the trial court correctly denied defendant's motion for a judgment of acquittal on the kidnapping charges.

We turn next to the charge of unlawful sexual penetration. The state sought to convict defendant under the

theory that he forcibly compelled the victim to engage in sexual penetration by way of either physical force or implied threat. ORS 163.411 provides, in relevant part, as follows:

"[A] person commits the crime of unlawful sexual penetration in the first degree if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and:

"(a)   The victim is subjected to forcible compulsion[.]"

Forcible compulsion, as defined in ORS 163.305(2), means to compel by:

"(a)   Physical force; or

"(b)   A threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person, or in fear that the person or another person will immediately or in the future be kidnapped."

Thus, to prove that charge, the state had to prove not only that defendant penetrated the anus of the victim with an object but that he compelled the victim to submit to that act by way of either physical force or express or implied threats. Defendant argues that the state failed to prove either.

We first address the "physical force" prong of ORS 163.305(2)(a). To prove that a defendant used forcible compulsion by way of physical force, the state must prove: (1) that a causal connection exists between the physical force at issue and the alleged contact; and (2) that the physical force used by defendant "was greater in degree or different in kind from the simple movement and contact that is inherent in the act of touching" and that that force was "sufficient to compel the victim to submit or engage" in the alleged contact "against the victim's will." *State v. Marshall*, 350 Or 208, 227, 253 P3d 1017 (2011) (discussing forcible compulsion in the related context of first-degree sexual abuse). Any forcible compulsion alleged must result in the *"particular"* contact at issue. *Id.* at 219 (emphasis in original).

In *Marshall*, the Oregon Supreme Court affirmed a finding that the defendant forcibly compelled the victim, to, among other things, touch the defendant's erect penis, where

"[t]he state presented evidence that defendant had 'forced' the victim's hand down inside defendant's pants and against his erect penis, and that the victim had 'pulled' or 'jerked' her hand away. Although the sexual touching was the victim's hand touching the defendant's penis, the 'physical force' was defendant's use of his own hands to cause the victim to engage in that sexual contact."

350 Or at 227. In that case, however, the court rejected the state's argument that the defendant had also forcibly compelled the victim to submit to the defendant's touching of her buttocks because "nothing in the record suggests that the * * * touching itself involved any greater or different force than was inherent in that particular sexual contact" when it lasted "a few seconds" and the defendant "immediately removed his hand" when the victim said "no." *Id.* at 228. Further, the court concluded that that "force did not restrain, trap, or physically coerce the victim in order to cause her to submit to defendant's later touching." *Id.* at 229.

Turning next to the "express or implied threat" prong of ORS 163.305(b), we have explained that the plain meaning of the term "threat," in this context, means:

"'**1:** an indication of something impending usu. undesirable or unpleasant * * * **a:** an expression of an intent to inflict evil, injury, or damage on another usu. as retribution or punishment for something done or left undone * * * **b:** an expression of an intention to inflict loss or harm on another by illegal means and esp. by means involving coercion or duress of the person threatened * * *.'"

*Magel,* 246 Or App at 730 (quoting *Webster's* at 2382) (boldface in *Webster's*). To prove that a defendant used forcible compulsion by way of express or implied threats, "there must be some kind of communication by the defendant to the victim of intent to inflict harm." *Id.* "That communication may be express, that is, directly and distinctly stated or expressed rather than implied or left to inference: not dubious or ambiguous * * * [or] [i]t may also be communicated or conveyed not by a direct, forthright statement but by allusion or reference likely to lead to [a] natural inference." *Id.* (internal quotation marks and citations omitted).

We have held that a defendant's "extended episode of violence directed at [a] victim" may communicate "an intent to inflict harm on the victim that was sufficient to compel [him or] her to submit to the sexual contact at issue." *State v. Jimenez*, 247 Or App 738, 745, 270 P3d 405 (2012). In *Jimenez*, the defendant was the victim's boyfriend, who, upon learning that she was spending time with a male friend, punched her in the face and kicked her while she was on the ground, among other assaultive behaviors, over the course of a day. *Id.* at 740-41. The defendant had been violent towards the victim in the past. *Id.* at 740. The defendant, during a second violent encounter on that same day, became angry with the victim, threw a drink at her, and forced her to perform oral sex on him. *Id.* at 742. After apologizing, the victim "assented" to having sex with the defendant, who was later convicted of first-degree rape, which includes a "forcible compulsion" element. *Id.* The defendant moved for a judgment of acquittal. He claimed that the state had failed to prove any forcible compulsion and instead argued that the victim had consented to sex; his motion was denied. *Id.* at 742. In affirming defendant's conviction on appeal, we reasoned that the "defendant communicated an intent to inflict harm on the victim that was sufficient to compel her to submit to the sexual contact at issue," and that "[a] rational factfinder could conclude that that extended course of conduct constituted an implied threat which communicated, by natural inference, that [the] defendant would harm the victim if he was angry or if she did not comply with his demands." *Id.* at 745.

In this case, defendant acknowledges that the evidence "supports a finding that he inflicted a grievous assault on the victim." He contends, however, that the state failed to prove that he used forcible compulsion to commit the crime of unlawful sexual penetration because there is no evidence that indicates "whether or how that assaultive behavior related to the penetrative act." Defendant contends that the victim's testimony establishes only "evidence of physical force" that was "followed, at some point, by the act of penetration." *Marshall*, defendant urges, "requires more than evidence that one thing followed the other."

The state responds that evidence in the record supports a finding that defendant used either physical force or threats, or both, to forcibly compel the victim into the penetrative act at issue. We agree with the state that, under either theory, the record in this case is sufficient to establish forcible compulsion.

Here, notwithstanding the victim's inability to reconstruct all that occurred in chronological detail, the record is sufficient to show that defendant committed the penetrative act in the course of an "extended episode of violence," *Jimenez*, 247 Or App at 745, in which the victim was threatened and severely beaten, and her freedom of movement was restrained. Defendant began his attack with physical violence, and, when the victim told defendant to stop or refused to comply with his demands, defendant engaged in additional violence, permitting a factfinder to infer a "causal connection" between defendant's assaultive behavior and the penetrative act at issue. *Marshall*, 350 Or at 225. The factfinder could also infer that defendant's rampant violence was "greater in degree and different in kind" than the "minimal force" required to commit the penetrative act. *Id.* A factfinder could also rationally infer that defendant's violent conduct leading up to the penetrative act "constituted an implied threat which communicated, by natural inference, that defendant would harm the victim if he was angry or if she did not comply with his demands." *Jimenez*, 247 Or App at 745. In short, a rational factfinder could determine that the penetrative act was "forcibly compelled" by either the physical violence that preceded it or the threat of more to come.

For the foregoing reasons, the trial court properly denied defendant's motion for judgment of acquittal.

Affirmed.