Argued and submitted January 27, remanded for resentencing, otherwise affirmed June 29, petition for review denied December 8, 2016 (360 Or 697)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DEMETRIUS LAVEL VAUGHAN-FRANCE,
aka Demetrius Lavell Vaughanfrance,
*Defendant-Appellant.*

Lane County Circuit Court
201308857; A155485

379 P3d 766

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

## SHORR, J.

Defendant appeals a judgment convicting him of various crimes that arose out of defendant's attack and confinement of his then-girlfriend at a Eugene-area motel. He raises nine assignments of error. We initially divide those assignments of error into two groups, those that assign error to the trial court's decisions during trial and those that assign error to the court's post-trial sentencing decisions.

In the first group, defendant raises three assignments of error. Defendant first contends that the trial court erred when it failed to dismiss a prospective juror for cause for actual bias. In his second assignment, defendant claims that the trial court erred when it denied defendant's motion for a judgment of acquittal on a first-degree kidnapping charge. In his third assignment, defendant claims that the trial court also erred when it denied defendant's motion for a judgment of acquittal on a second-degree assault charge. We write to address the first and second assignments of error and, as discussed below, we affirm the trial court with respect to those assignments of error. With respect to the third assignment of error, we reject that assignment without further discussion.

As to the fourth through ninth assignments of error, relating to sentencing issues, the state concedes in response to the fourth assignment of error that the trial court erred when it imposed an upward departure on Count 3 (coercion) based, in part, on the mere existence of a pending Washington state arrest warrant. We agree that the trial court so erred and accept the state's concession. Because we remand for resentencing on the fourth assignment of error, we do not reach defendant's remaining assignments of error five through nine relating to additional sentencing issues. Accordingly, we affirm defendant's convictions, but remand for resentencing.

We state the facts that gave rise to the convictions below in the light most favorable to the state. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). On the night of May 6, 2013, the victim was staying in a Eugene-area motel room with defendant, who was her boyfriend at the time. Three

acquaintances and the manager of the motel were at least aware that she was staying in the motel room that night.

During the night, defendant saw a text on the victim's phone from a male friend. Defendant did not like the content of the text and started raising his voice and arguing with the victim. Defendant then took the victim's phone and started hitting her on the side of the head with it. The victim got up to leave, but defendant pulled out a knife and threatened her. Defendant continued to hit her and move the knife around her, which the victim assumed caused the bleeding on her head. After noticing that the victim was bleeding, defendant grabbed her by the hair and dragged her into the shower. While the victim was in the shower, defendant started to kick her in the back. During the attack, defendant threatened the victim that he would assault her family if she got him in trouble.

As a result of defendant hitting the victim with her cell phone, it shattered and was rendered inoperable. At some point during the night, defendant also unplugged the motel room phone.

Later during the attack, defendant appeared to calm down and the victim made her way toward the door. Defendant grabbed a knife, brought it up the victim's back and cut her leg in the process. Defendant forced the victim back onto the bed in the motel room. At various points, he also strangled and bit the victim. During the attack, defendant kept two knives open and out in one of his hands. He kept the knives near the victim for hours and occasionally pushed them against her.

At some point during the attack, a man came to the door to ask for his television remote control back. Defendant told the victim to hide in the bathroom. The victim thought about trying to run out at that point, but was scared that defendant would follow through on his threats to harm her family. Defendant and the victim had, earlier in the evening, met the man who had come to the door and had borrowed the remote control from him.

At another point in the night, likely earlier in the evening, a person from the neighboring room heard yelling

from defendant. The neighbor came over to defendant and the victim's room to check on things. Defendant visited with the neighbor outside the motel room. During the ordeal, the victim was told to be quiet and understood that, if she made a noise, her throat would be slit.

The victim believed the attack in the motel room lasted from roughly midnight to 6:00 a.m. Defendant finally stopped his attack and began to calm down around dawn the next morning when the victim began telling defendant things he wanted to hear. The victim then told defendant that they should change motel rooms because someone had probably heard the commotion and yelling in their room. She told defendant that he should go ahead of her to the next motel so as not to raise suspicions in light of her physical condition. After defendant left the motel room, the victim contacted the motel manager and went back to her room to call 9-1-1.

With those background facts in view, we turn to a discussion of the applicable law. As noted, among other charges, the state charged defendant with first-degree kidnapping. ORS 163.235(1)(d) provides that a person is guilty of the crime of first-degree kidnapping if he commits second-degree kidnapping, defined in ORS 163.225, with the purpose "[t]o terrorize the victim or another person." ORS 163.225(1), in turn, provides, in part:

"A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"* * * * *

"(b) Secretly confines the person in a place where the person is not likely to be found."

The state's theory, based on the facts recounted above, is that defendant violated ORS 163.225(1)(b) by secretly confining the victim in the motel room in general and in the bathroom in particular so she would not be seen or heard, even by a visitor to the room, while assaulting her and threatening her and her family if she spoke.

At the close of the state's case, defendant moved for a judgment of acquittal on the first-degree kidnapping charge. Among other things, defendant argued that the state did not present evidence that the victim was secretly confined in a place where she was unlikely to be found because a few people were aware she was staying in the motel room. Defendant also argued that any purported confinement or interference with the victim's liberty was merely incidental to the other criminal conduct at issue and, as a result, could not give rise to the separate crime of kidnapping. The trial court denied defendant's motion for judgment of acquittal on the first-degree kidnapping charge, concluding that there was sufficient evidence from which a reasonable juror could find that defendant intended to secretly confine the victim away from people, particularly when he forced her into the bathroom and threatened her to remain silent in an effort to hide her from a visitor.

## THE MOTION FOR JUDGMENT OF ACQUITTAL ON THE FIRST-DEGREE KIDNAPPING CHARGE

As noted, defendant assigns error to the trial court's denial of his motion for judgment of acquittal on the first-degree kidnapping charge. Defendant raises some of the same arguments that he raised below, primarily focusing on the argument that the state did not present evidence of confinement "in a place where [the victim] was not likely to be found," ORS 163.225(1)(b), and that any purported kidnapping was merely incidental to the other charged crimes.

In reviewing a denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the state, resolving any conflicts in the evidence in favor of the state, and then draw all reasonable inferences in the state's favor. *State v. Walker*, 356 Or 4, 6, 333 P3d 316 (2014). After doing so, we then determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *King*, 307 Or at 339. "Our decision is not whether we believe defendant is guilty beyond reasonable doubt, but whether the evidence is sufficient for a jury so to find." *Id.*

We begin our analysis with the text of the relevant statute, ORS 163.225(1)(b), and its context. *State v. Gaines*, 346 Or 160, 166, 206 P3d 1042 (2009). Under the state's secret-confinement theory, the state was required to prove that defendant "[s]ecretly confine[d] the person in a place where the person is not likely to be found." ORS 163.225(1)(b). Defendant claims that, because several people—including the motel staff, a mutual friend who had visited before the attack, and the acquaintance who returned the remote—were aware that the victim was staying in the motel room that evening, defendant could not have "secretly" confined her in the motel room or the bathroom within the motel room, because the motel room was the location where she was "likely to be found."

Both we and the Supreme Court have examined the text of ORS 163.225(1)(b) and interpreted the phrase "[s]ecretly confine[d] *** in a place where the person is not likely to be found." *See Wal-Mart Stores, Inc. v. City of Central Point*, 341 Or 393, 397, 144 P3d 914 (2006) (stating that the context of a statute includes prior opinions by the Supreme Court interpreting the relevant statutory text). In *State v. Parkins*, 346 Or 333, 342, 211 P3d 262 (2009), the Supreme Court, examining the "plain, natural, and ordinary meaning" of the secret-confinement phrase, determined that it means "a place where it is not probable that the person will be located, either accidentally or through searching."

In *Parkins*, the victim, an 11-year-old girl, was at her home with her older sister and the defendant while the sisters' mother was away from the home. *Id.* at 335-36. While the victim's older sister was on the front porch, the defendant lured the victim into her mother's upstairs bedroom, locked the door behind her, pinned her on the bed, and physically and sexually assaulted her, while threatening her and telling her not to scream. *Id.* at 336. The victim's sister was outside on the front porch during the attack and was at least aware that her sister had gone to an upstairs bedroom to see the defendant. *Id.* at 336, 344. The sister eventually went upstairs and rattled the doorknob of the bedroom door. *Id.* at 336. The defendant then let the victim up and the victim ran out of the bedroom. *Id.*

The defendant was convicted of various sex abuse crimes as well as the crime of first-degree kidnapping. *Id.* The defendant argued to the Supreme Court that the trial court erred in denying his motion for judgment of acquittal on the kidnapping charge. *Id.* at 335. The Supreme Court agreed that the defendant was not secretly confining the victim in a place she was unlikely to be found because she was in her mother's bedroom in her own home, her sister was aware that that was where she had gone, and her sister eventually went upstairs and found her there. *Id.* at 343-44. Applying the text "secretly confine[d] *** in a place where the person is not likely to be found," the court observed that the victim was not in a place where it was improbable that she would be located "either accidentally or through searching." *Id.* at 342. The court concluded that it was *likely* that the victim would have been found—in the place where she was actually found—because that is where her sister last understood she was going in their home and where her sister went to find her. *Id.* at 344.

*Parkins*, however, was careful to state that the test is fact dependent, as it stated that "determining whether a person was secretly confined in a place where the person is not likely to be found must take *into* account the circumstances of the place, the victim, and the defendant's actions." *Id.* at 343. It also expressly limited its holding to the "particular factual circumstances of *this* case." *Id.* at 344 n 4 (emphasis in original). It further provided that it was not announcing a general rule

> "that a room in one's own home can never be a 'place where the person is not likely to be found' when another person is present in the home for purposes of ORS 163.225(1)(b). Neither do we hold that secret confinement in a 'place *** not likely to be found' cannot include places where the victim is actually—if accidentally—found."

*Id.*

The facts in *Parkins* stand in some contrast to the facts in *State v. Montgomery*, 50 Or App 381, 624 P2d 151, *rev den*, 290 Or 727 (1981). In *Montgomery*, the defendant was assaulting the victim in the victim's apartment. *Id.* at 383. During the assault, the defendant's brother closed some

of the curtains in the apartment and shut the front door. *Id.* When police arrived outside to check on the apartment and its resident, the defendant and his brother pulled the victim into his bathroom and held a knife at his throat, threatening to cut his throat if he made a sound. *Id.* The defendant then shut the door to the bathroom, and the defendant's brother went outside to talk to the police and lied to the police that the victim had left the apartment. *Id.* at 383-84. The police looked through one unobstructed window, shook and knocked on the front door, and, without hearing any response, left soon after. *Id.* at 384. Based on those facts, we concluded that the defendant had "secretly confined" the victim in the bathroom by securing the victim behind closed doors and holding him at knifepoint so the victim would not respond to the officer's knocks. *Id.* at 386.

In *Montgomery*, we held that the victim was secretly confined in a place he was "not likely to be found." *Id.* Even though the victim's own bathroom is "not ordinarily a place where that person is not likely to be found, the room can be made into such a place by the efforts of the kidnapper" to insure that the police do not find the victim in his apartment. *Id.* at 386-87. *Montgomery* predated the Supreme Court's decision in *Parkins*. *Parkins* discussed *Montgomery*, but only to the extent that the Supreme Court stated that it was not passing judgment on *Montgomery*'s facts and that, as noted above, each case was dependent on "the circumstances of the place, the victim, and the defendant's actions." *Parkins*, 346 Or at 343.

Applying the text of the statute and the principles from the cases above, we conclude that the trial court did not err in denying the motion for judgment of acquittal on the first-degree kidnapping charge because a reasonable juror could find from the evidence in this record that defendant "secretly confined" the victim in a place she was "not likely to be found." "The circumstances of the place, the victim, and the defendant's actions" support that conclusion. *Id.*

With respect to place, the victim was staying at a motel room. While there was some evidence that motel staff, an acquaintance, and a visitor were aware that defendant

and the victim were staying at the motel room and may have been there at discrete times, lodging in a motel room is a transient act by nature. Viewing the facts in the light most favorable to the state, it is not evident from the record that anyone knew the victim was present in the motel room during the attack, which lasted for most of the latter part of the night.

More importantly, with respect to the circumstances of the conduct of defendant and the victim, whenever third parties went to the motel room during critical points of the attack—a neighbor early in the evening to check if everything was okay in the room after hearing noises and an acquaintance to obtain a remote control—defendant actively concealed the victim. Viewing the facts in favor of the state, it is apparent that, when the neighbor knocked on the door, defendant met him outside the room and the victim understood that her throat would be slit if she made a noise. Significantly, when the acquaintance knocked, defendant moved the victim into the bathroom and forced her to hide there based on implied and explicit threats of violence to her and her family. The circumstances also include the fact that defendant unplugged the motel phone and smashed the victim's cell phone.

Thus, to the extent that defendant argues that third parties might have located the victim in the motel room, which they did not during the long attack, "either accidentally or through searching," the circumstances indicate that defendant actively prevented third parties who may have aided the victim, including an apparently concerned neighbor and an acquaintance, from discovering her. *See State v. Kawamoto*, 273 Or App 241, 250-51, 359 P3d 305 (2015) (citing *Montgomery*'s holding that "a victim may be 'not likely to be found' even in an obvious place, if assailants take steps to conceal the victim's whereabouts" and concluding that "calculated efforts to conceal a confined victim from individuals who may *actually* render aid bolsters the unlikelihood that the victim will be found" (emphasis in original)).

This case is unlike *Parkins*, where a third party, the victim's sister, was fully aware that the victim was upstairs with the defendant in a bedroom in the victim's

house during the significant points in time. The third party understood her sister to have gone to an upstairs bedroom with the defendant and, in fact, later found her there during the defendant's attack. This case is closer to—and, indeed, its conclusion perhaps more obvious than—*Montgomery*. In that case, the defendant similarly concealed the victim by force in a bathroom, albeit a bathroom in the victim's own apartment, while third parties, the police, were looking to contact the victim. 50 Or App at 383-84. We still found that such evidence was sufficient to withstand the defendant's motion for judgment of acquittal. *Id.* at 386. In any event, applying the test in *Parkins*, we conclude that there is sufficient evidence from which a reasonable juror could find that defendant "secretly confined [the victim] in a place where the person is not likely to be found." ORS 163.225(1)(b).

Defendant also argues that the trial court erred because the legislature "intended that there be no conviction of the defendant for the separate crime of kidnapping where the detention or asportation of the victim is merely incidental to the accomplishment of another crime, particularly that of robbery or rape." *State v. Garcia*, 288 Or 413, 420, 605 P2d 671 (1980).[1] The "primary means" by which the legislature accomplished the goal of ensuring that the unlawful interference is not merely incidental to another crime is "through the narrowly crafted intent element that requires the state to prove that the defendant intended to interfere substantially with the victim's liberty." *State v. Sierra*, 349 Or 506, 514, 254 P3d 149 (2010), *aff'd as modified*, 349 Or 604 (2011). Thus, ORS 163.225(1) requires an "intent to interfere substantially with another's personal liberty." That intent element is met if the defendant intends "to confine the victim for a 'substantial period of time.'" *State v. Wolleat*, 338 Or 469, 475, 111 P3d 1131 (2005) (quoting *Garcia*, 288 Or at 421).

The state argues that defendant failed to challenge the sufficiency of the evidence as to the *intent* element, but

---

[1] The state's theory in this case depends on proof of an unlawful "detention" and secret confinement under ORS 163.225(1)(b) and is not dependent on an "asportation" or unlawful movement of the victim from "one place to another" under ORS 163.225(1)(a).

that, even if he had, there is sufficient evidence of defendant's intent to substantially interfere with the victim's personal liberty for us to affirm the trial court's denial of the motion for judgment of acquittal. We conclude that defendant did sufficiently raise that issue, but, regardless, agree with the state that there is sufficient evidence in the record from which a reasonable juror could find that defendant intended to, and did, substantially interfere with the victim's personal liberty over a "substantial period of time."

Defendant made substantial efforts to conceal the victim in the motel room and bathroom on at least two separate occasions when there were visitors, and he held her against her will and without phone contact with the outside world for most of the night and into the morning. There was sufficient evidence from which a reasonable juror could find that the interference with the victim's personal liberty was substantial and not merely "incidental" to another crime. As a result, we affirm the denial of defendant's motion for judgment of acquittal.

## THE "FOR CAUSE" CHALLENGE
## TO A PROSPECTIVE JUROR

Defendant also assigns error to the trial court's refusal to remove a prospective juror for cause. During jury selection, the trial court asked prospective jurors whether they felt their personal views on domestic violence might affect their ability to be fair or impartial. At least 11 jurors responded affirmatively, and, after brief inquiries with those jurors, the trial court dismissed five of them for cause. During additional questioning by the parties' lawyers that probed similar issues, another five jurors (or 10 in all) were dismissed for cause.

There was one prospective juror (juror Z) who was not dismissed for cause. Juror Z initially stated that she had been "terrorized a lot and it just brings up a lot of emotions," and that, although she probably could follow the court's instructions, "I don't think I could be fair." Defendant moved to dismiss that juror for cause, but the state argued that the motion was premature because the juror had only stated that she thought she could not be fair, but had not absolutely

stated that she could not be fair. Juror Z later explained that she had a long past experience as a victim of domestic violence and had been raped as a young child. She also volunteered that she was a mental health counselor who worked with male felons. She stated that she did not know defendant and that, in her experience with the felons with whom she worked, she did not "hold things against them, either." During this part of the *voir dire*, she responded to the question whether she could be fair by stating "I don't know. * * * I'm still working on it."

Defendant again moved to dismiss juror Z for cause. The court asked juror Z if she could follow the law, and she was initially hesitant, explaining that she may have a different logical process in her "head" than the emotional response in her "heart." The court then asked juror Z if, despite her personal feelings, she could follow the law and treat the facts in the trial separately from her past experience. Juror Z concluded by responding affirmatively. The trial court then denied defendant's motion to remove juror Z for cause.[2] As noted, defendant assigns error to that ruling.

Under Article I, section 11, of the Oregon Constitution[3] and the Sixth Amendment to the United States Constitution,[4] defendants in a criminal trial are guaranteed a right to an impartial jury. ORCP 57 D(1)(g),[5] applicable

---

[2] The state passed the juror for cause, and defendant had no remaining peremptory challenges.

[3] Article I, section 11, provides, in relevant part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed * * *."

[4] The Sixth Amendment provides, in relevant part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed * * *."

The Sixth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Duncan v. Louisiana*, 391 US 145, 149-50, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

[5] ORCP 57 D(1)(g) provides, in part, that a challenge for cause may be taken based on "actual bias," which is "the existence of a state of mind on the part of a juror that satisfies the court, in the exercise of sound discretion, that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging the juror."

to criminal trials through ORS 136.210(1), provides that a party may challenge any prospective juror for "actual bias." To determine whether there is actual bias or lack of partiality, the trial court must determine "whether the prospective juror's ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." *State v. Barone*, 328 Or 68, 74, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000); *see also Wainwright v. Witt*, 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841 (1985) (stating similar test for determining whether a juror should be excused for bias as whether "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" (internal quotation marks omitted)).

Under our standard of review, "[t]he question whether a juror is biased is one of fact, to be determined by the trial court from all the circumstances, including the challenged juror's demeanor, apparent intelligence, and candor." *Barone*, 328 Or at 74. We have stated that,

"[b]ecause the trial court has the advantage of observing a challenged prospective juror's demeanor, apparent intelligence, and candor, that court's judgment as to the prospective juror's ultimate qualifications is entitled to great weight."

*State v. Dalessio*, 228 Or App 531, 536, 208 P3d 1021 (2009). As a result, we defer to the trial court's discretion on challenges for actual bias, and the trial court's rulings "will not be disturbed except for abuse of discretion." *Barone*, 328 Or at 74.

Applying that standard of review, we cannot say on this record that the trial court abused its discretion. There is no doubt that the facts that the attorneys and court elicited from juror Z during their colloquy indicated that she initially struggled with the effect that her own personal history would have on her ability to be fair. She also made a range of equivocal statements about her ability to be fair. She initially stated, "I don't think I could be fair," later stated she did not know whether she could be fair, further volunteered that she might be fair because she felt she was

fair with the felons with whom she worked in her job, and finally affirmed, in response to the court's questions, that she could set aside her past from the facts in this case and apply the law.

The Supreme Court has stated that "it is in situations in which a potential juror's answers are contradictory or unclear that the trial court's discretion most meaningfully may come into play." *Barone*, 328 Or at 78. The trial court's first-hand observation and understanding of the juror's background "may enable the trial court to make sense of seemingly contradictory statements." *Id.*

Here, juror Z's statements clearly indicate that she was struggling with her personal feelings regarding the charged crimes and initially questioned her ability to be fair. She concluded by affirming that she could apply the law and facts apart from the facts of her own past experience. As this is a factual issue for which the trial court may exercise discretion based on its first-hand observations, we conclude that there is not a clear factual record that juror Z was biased in a manner that "would impair substantially * * * her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." *Id.* at 74.

Defendant cites our decisions in *Dalessio* and *State v. Carter*, 205 Or App 460, 134 P3d 1078 (2006), in support of his argument that the trial court abused its discretion in failing to excuse juror Z for cause. In *Dalessio*, the juror was a former police officer who was impaneled in a trial involving an attempted aggravated murder of police officers. 228 Or App at 533. In *voir dire*, the juror initially replied to the question whether he could be fair and impartial stating, "I'll try to be as fair as I can," and he was impaneled in the jury. *Id.* After trial commenced, the juror approached the court and told the judge he was questioning whether he should be on the jury. *Id.* at 534. Following further questioning by counsel and the court, the juror stated that he thought that he should not be sitting on a jury involving an assault on police officers because of his personal experiences as an officer, which were causing him to make "some judgments * * * that I really shouldn't be making." *Id.* at 535. When asked

about his prior statement at *voir dire*, the juror admitted that he had only stated that because he thought that he would not be placed on the jury anyway. *Id.* After that admission, the juror never reaffirmed his *voir dire* statement by stating that he could be fair. *Id.* at 536. The Supreme Court concluded that the trial court's failure to remove the juror for actual bias was an abuse of discretion. *Id.* at 540. The Supreme Court found persuasive that the juror had effectively disclaimed his prior *voir dire* statement that he could be fair and, after expressing uncertainty about jury service, never reaffirmed that he could be fair. *Id.* at 539-40.

In *Carter*, the prospective juror initially stated "No" in response to the question whether he thought he could be fair. 205 Or App at 463. The trial court followed up by asking whether he could set aside his personal feelings and follow the law, and the prospective juror eventually replied "I guess I could try." *Id.* at 464. The Supreme Court held that it was an abuse of discretion for the trial court to fail to excuse the juror for cause. *Id.* at 467-68. The court noted that the juror had initially stated "without qualification that he did not think that he could be fair" and, significantly, only later stated that he "guess[ed]" he "could try" to follow the law, but never affirmed that he actually would. *Id.* The court contrasted that response to the facts in *State v. Fanus*, 336 Or 63, 84, 79 P3d 847 (2003), *cert den*, 541 US 1075 (2004), where the prospective juror was properly impaneled even though she initially stated that she was biased against defendant based on the pretrial publicity, but, following further rehabilitative questioning, concluded that she would be able to judge the defendant fairly, would base her decision on the evidence, and did not have a fixed opinion as to guilt in advance of trial. *Carter*, 205 Or App at 465-66.

We conclude that *Dalessio* and *Carter* do not control here. In those cases, the prospective jurors expressly called into question their ability to serve fairly and either continued to affirm that position or, at best, "guessed" that they could "try to be fair." Here, as in *Fanus*, while juror Z initially made a statement that indicated that she did not think she could be fair, she later vacillated and finally concluded by saying that she could set aside her personal feelings and decide the case on the law and facts. *See also*

*State v. Montez*, 309 Or 564, 593, 789 P2d 1352 (1990) (juror properly impaneled who initially stated that, on a scale of one-to-10, the odds were "a three, four" that he could not be fair and set aside his personal feelings, but then later stated that he would set aside his personal feelings, be fair, and follow the law). We hold that, under these circumstances and based on its first-hand observations of the juror, the trial court did not abuse its discretion in denying the motion to remove juror Z for cause.

## THE ASSIGNMENTS OF ERROR ON THE SENTENCING DECISIONS

Finally, defendant's assignments of error four through nine assign error to various sentencing decisions. In his fourth assignment of error, defendant assigns error to the trial court's decision to impose an upward departure from the presumptive sentence on Count 3 (coercion). The trial court imposed both a dispositional departure and a durational departure, which required two departure grounds (one for each type of departure). OAR 218-008-005(3). The court relied on (1) defendant's persistent involvement in similar offenses and (2) the fact that defendant committed his crime when "another matter was pending." For that second departure ground, the trial court relied on the fact that defendant had an arrest warrant pending in Washington for "felony, telephonic harassment, domestic violence."

Defendant argues that the existence of a pending arrest warrant, on its own, is not a "substantial and compelling" reason for a departure under OAR 213-008-0001. Our review is limited to whether the trial court's findings of fact and reasons justifying a departure from the presumptive sentence "(a) [a]re supported by evidence in the record; and (b) [c]onstitute substantial and compelling reasons for departure." ORS 138.222(3).

The state concedes that the trial court erred in imposing an upward departure based merely on the existence of a pending arrest warrant. The state concedes that the existence of an arrest warrant, "without more," is not a substantial and compelling reason for departure. We accept the state's concession and remand the case for resentencing.

We have held that the commission of a crime while a defendant was on probation or release in another criminal case may be a "substantial and compelling reason" for upward departure, indicating the defendant's failure to be deterred from committing crimes while on probation or release in pending criminal matters. *See, e.g., State v. Nelson,* 119 Or App 84, 86-87, 849 P2d 1147 (1993) (stating same and citing prior cases). However, we cannot conclude that the existence of an unserved arrest warrant, standing alone, is a "substantial and compelling reason" for an upward departure. An arrest warrant is merely an accusation by the state, requiring probable cause, and not an adjudication. Further, there was no evidence presented regarding whether defendant was even aware of the outstanding Washington state warrant, so it would not be accurate to state that defendant engaged in any misconduct while aware that he was facing potential criminal liability. As a result, we accept the state's concession and remand for resentencing. *See State v. Gibson,* 183 Or App 25, 35, 51 P3d 619 (2002) (remanding for resentencing where court's findings were inadequate to determine what factor or factors the court relied on regarding each departure sentence).

Because we remand the case for resentencing, we do not reach assignments of error five through nine, which also claim error in the original sentencing proceedings, because defendant can raise those issues at resentencing.

Remanded for resentencing; otherwise affirmed.